UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| Edgar Pichardo, | Civil Action No. 13-6930 (KM) |
| Petitioner, | |
| v. | OPINION |
| Kenneth Nelson, et al., | |
| Respondents. | |

**APPEARANCES**:

Edgar Pichardo, *pro se*
#538545
South Woods State Prison
215 Burlington Road South
Bridgeton, NJ 08302

Keith E. Hoffman
Senior Assistant Prosecutor
Passaic County Prosecutor's Office
401 Grand Street
Paterson, NJ 07505

**MCNULTY**, District Judge

The petitioner, Edgar Pichardo, filed this petition for habeas corpus relief pursuant to 28 U.S.C. § 2254, in which he brings claims of ineffective assistance of trial and appellate counsel. As to appellate counsel's failure to raise one issue regarding the imposition of aggravating factor 1 at sentencing, however, it is granted. I will therefore do what I believe the Appellate Division, if counsel had presented it with the issue, would have done: remand the matter for resentencing without aggravating factor 1. For the reasons set forth below, the petition is otherwise denied.

## I. FACTS

On the night of August 27–28, 2003, AY threw a party in the basement of her Hawthorne, New Jersey, home to celebrate the seventeenth birthday of her boyfriend, RV.[1] (*See* ECF No. 9-19 at 41.) Later that evening, a person known as "Chino" arrived at the party. RV gave Chino a hug to thank him for coming. Chino felt disrespected by this, and immediately left. (*Id.*) At about 1:00 a.m., Chino returned to the party with "five to eight other men," including Mr. Pichardo. (*Id.* at 42.) Chino and his friends beat RV and another boy almost unconscious and fled when AY threatened to call the police. (*Id.*)

Other guests at the party, distressed, called their own friends to go find Chino. RV called his cousin DJ to ride with him to River Street in Paterson, a locale Chino was known to frequent. (*Id.*) Two other boys, AG and EW, drove in a separate car to the same area. As DJ and RV drove down River Street, they saw a "group of approximately fifteen people standing in front of the building in which [Mr. Pichardo] lived." (*Id.*) Both cars drove further down River Street, made U-turns, and again drove past Mr. Pichardo's apartment building. The cars drove down River Street a second time, again made U-turns, and again approached Mr. Pichardo's apartment building. In the interim, Mr. Pichardo had obtained a rifle from his apartment.

The nature and status of the gun were critical to the trial, as they are to certain of the issues here. It was a Hi-Point 9mm rifle (exhibit S-42). The rifle had what the parties variously called an "infrared" scope, "laser" scope, or sight, but that nomenclature does not appear to be accurate. The rifle's original owner described the scope as having within it an aiming point consisting of an internal red beam, or illuminated red dot: "[W]hatever that red dot is on is what you will hit."[2] (ECF No. 9-10 at 87–88; ECF No. 9-11 at 43–44) To function, the scope

---

[1]      These facts are taken from the Appellate Division opinion on direct appeal, supplemented by references to the trial transcript. (*See* ECF No. 9-19 at 41-45.) Persons identified by initials or first names were minors at the time of the events.

[2]      I take this to refer, not to the kind of laser sight which focuses a beam onto the

2

requires electric power from a battery. It has settings from 0 (*i.e.,* off) to 11. (ECF No. 9-10 at 88) (The transcript does not clarify whether "size" referred to the brightness of the dot, its arc size, or both.)

It was uncontested that, three weeks before the shooting, the scope had been operational; three weeks later, it was not, apparently because the battery was dead. (The State's firearms expert stated that the scope was not operational when he inspected the weapon, but did not otherwise describe the operation of the scope. (ECF 9-10 at 27)) There was no direct evidence of the scope's condition on the night of the incident. No witness testified as to whether it was operating at all, whether the battery was fresh, whether it was turned on, or where it was set in the 0 to 11 range.

Carrying that gun, Mr. Pichardo stepped out from behind a parked car and fired two shots. One of the shots hit nothing. The other went through the rear window of the second car and struck EW in the back of the head, killing him. (*Id.* at 43.) Mr. Pichardo went inside his family's apartment to hide. He maintains that, at the time, he had no idea he had hit anything, let alone killed someone. (*See* ECF No. 9-11 at 10; 9-22 at 6.) Based on DJ's on-scene identification, Mr. Pichardo was arrested and brought to police headquarters, where he waived his *Miranda* rights and gave a statement. (*Id.*)

## II. PROCEDURAL HISTORY

Mr. Pichardo was indicted for first degree murder, N.J. STAT. ANN. § 2C:11-3(a)(1), (2); second degree possession of a weapon for an unlawful purpose, N.J. STAT. ANN. § 2C:39-4; third-degree unlawful possession of a weapon, N.J. STAT. ANN. § 2C:39-5(c); and third degree receiving stolen property, N.J. STAT. ANN. § 2C:20-2(a).

---

target itself, or to an infrared night vision scope, but to a red dot sight. "A red dot sight is a common classification for a type of non-magnifying reflector (or reflex) sight for firearms, and other devices that require aiming, that gives the user an aimpoint in the form of an illuminated red dot." https://en.wikipedia.org/wiki/Red_dot_sight (visited Dec. 14, 2015) (citing House, James E. (2005). The Gun Digest Book of .22 Rimfire: Rifles·Pistols·Ammunition. Google Books (Gun Digest Books), p. 64).

At the conclusion of trial, Mr. Pichardo was acquitted of murder but convicted of the lesser included offense of aggravated manslaughter. (ECF No. 9-15.) He was acquitted of possession of a weapon for an unlawful purpose, but convicted of the other weapons offense, as well as receipt of stolen property (*i.e.,* the gun, which had been taken from the owner's home three weeks before the shooting). (*Id.*)

On September 30, 2005, Mr. Pichardo was sentenced. Judge Subryan merged the weapon offense with the aggravated manslaughter offense and sentenced Pichardo to twenty-two years' incarceration, subject to the No Early Release Act. *See* N.J. STAT. ANN. § 2C:43-7.2. Judge Subryan also sentenced Pichardo to a four-year term of incarceration for receiving stolen property, consecutive to the manslaughter sentence. (ECF 9-16 at 21; ECF No. 9-22 at 28.) (References to sentencing herein, unless otherwise specified, pertain to the 22-year sentence for aggravated manslaughter.)

At sentencing, Judge Subryan assessed three aggravating factors against Mr. Pichardo: nature and circumstances of the offense, *i.e.,* its commission in an especially heinous, cruel or depraved manner (N.J. STAT. ANN. § 2C:44-1(1)); risk of committing a future offense given history as a juvenile (N.J. STAT. ANN. § 2C:44-1(3)); and need for deterrence (N.J. STAT. ANN. § 2C:44-1(9)). The judge found one mitigating factor: leading a law-abiding life for a substantial period of time (N.J. STAT. ANN. § 2C:44-1(b)(7)). The sentencing judge found that the aggravating factors "substantially outweighed" the mitigating one. (ECF 9-16 at 26–27.)

Mr. Pichardo filed a direct appeal. He argued that, although the jury had acquitted him of the murder charge, the trial court should have entered a judgment of acquittal *sua sponte,* and that its failure to do so "tainted" the jury's verdict of aggravated manslaughter. (*See* ECF No. 9-19 at 45.) Pichardo also argued on direct appeal that his sentence was "manifestly excessive." (*Id.*) On March 10, 2008, the Appellate Division affirmed Pichardo's conviction and

4

sentence. (*Id.*) On June 3, 2009, Pichardo filed a petition for certification, which was denied by the New Jersey Supreme Court. *State v. Pichardo*, 195 N.J. 524 (2008).

Meanwhile, in June of 2008, Mr. Pichardo had filed a petition for post-conviction relief ("PCR") with the Superior Court of New Jersey, Law Division, Passaic County. The PCR petition alleged ineffective assistance of trial counsel for failing to review discovery with Pichardo, and for failing to investigate and call witnesses on Pichardo's behalf. It alleged ineffective assistance of appellate counsel for failing to challenge Judge Subryan's use of aggravating and mitigating factors.[3]

Judge Joseph A. Falcone heard testimony from Mr. Pichardo and his trial counsel, and denied the PCR petition in an oral opinion. (*See* ECF No. 9-18.) Pichardo appealed that denial to the Appellate Division. On appeal, Pichardo supplemented the grounds asserted by counsel, faulting earlier appellate counsel for failing to challenge Judge Subryan's evidentiary rulings, failing to challenge Judge Subryan's use of aggravating and mitigating factors, relying on unsupported facts in sentencing, failing to challenge improper jury instructions, and failure to challenge Judge Subryan's decision to admit in evidence the scope from Pichardo's rifle. The appellate court affirmed the Law Division in a written opinion. (*See* ECF No. 9-22.) The New Jersey Supreme Court denied certification on December 19, 2012. (*See* ECF No. 9-23.)

On November 15, 2013, Mr. Pichardo filed a petition with this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.

---

[3]     Although the record is not quite complete, I find sufficient evidence that these claims were raised in the trial level PCR court. At any rate, they were clearly raised and considered on appeal from the denial of PCR. *See, e.g.,* Section IV.B.1 & n.5; IV.E.2 & n.30, *infra.*

### III. CLAIMS

Mr. Pichardo presents the following claims in his habeas petition:

**Ground One**: Ineffective Assistance of Trial Counsel for failing to investigate witnesses and communicate with Mr. Pichardo; Ineffective Assistance of Appellate Counsel for failing to challenge trial judge's evidentiary rulings.

**Ground Two**: Ineffective Assistance of Appellate Counsel for failing to raise that the sentencing court relied on "unsupported facts" when sentencing Mr. Pichardo.

**Ground Three**: Ineffective Assistance of Appellate Counsel for failing to challenge the sentencing court's misapplication of aggravating factor 1.

**Ground Four**: Ineffective Assistance of Appellate Counsel for failing to challenge trial court's decision to repair the scope on Mr. Pichardo's rifle during trial.

**Ground Five**: Ineffective Assistance of Appellate Counsel for failing to challenge trial court's allowance of testimony from the rifle's original owner.

**Ground Six**: Ineffective Assistance of Trial Counsel for failure to call pertinent witnesses on Mr. Pichardo's behalf.

The petition will be denied, except as to Ground Three, which will be granted. I find that appellate counsel was constitutionally ineffective for failing to challenge the sentencing court's employment of aggravating factor 1: commission of the offense in an especially heinous, cruel, or depraved manner.

### IV. DISCUSSION

#### A.   Habeas Claims of Ineffective Assistance of Counsel: Standards

Title 28, United States Code, Section 2254, provides that the district court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is

6

in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). A petitioner has the burden of establishing each claim in the petition. *See Eley v. Erickson,* 712 F.3d 837, 846 (3d Cir. 2013). Under 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), federal courts in habeas corpus cases must give considerable deference to determinations of the state trial and appellate courts. *See Renico v. Lett,* 599 U.S. 766, 772 (2010).

Section 2254(d) sets the standard for granting or denying a writ of habeas corpus:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In *Williams v. Taylor,* 529 U.S. 362, 412-13 (2000), the Supreme Court explained the application of § 2254(d)(1). The Court analyzed subsection 1 as containing distinct clauses: the "contrary to" clause and the "unreasonable application" clause.

Under (d)(1)'s "contrary to" clause, "a federal court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the U.S. Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Id.*

Under (d)(1)'s "unreasonable application" clause, a federal court may grant the writ if "the state court identifies the correct governing legal principle from [the

Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. For purposes of § 2254(d)(1), "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams*, 529 U.S. at 366 (emphasis in original).

Together, the clauses of Section 2254(d)(1) apply to questions of mixed law and fact. Purely factual questions, however, fall under 28 U.S.C. § 2254(d)(2).

In conducting the (d)(2) factual analysis, a federal court must confine its examination to evidence in the state court record. *See Cullen v. Pinholster*, 563 U.S. 170, 182, 131 S. Ct. 1388, 1398 (2011). In addition, the state court record should be reviewed to assess the reasonableness of the state court's factual determinations. *See id.* Finally, federal courts are required to apply a "presumption of correctness to factual determinations made by the state court." *Fahy v. Horn*, 516 F.3d 169, 181 (3d Cir. 2008); *see also* 28 U.S.C. § 2254(e)(1). The Third Circuit has ruled that this presumption of correctness based upon state court factual findings can be overcome only by clear and convincing evidence. *See Lewis v. Horn*, 581 F.3d 92, 109 (3d Cir. 2009). A state court decision is based on an unreasonable determination of the facts only if the state court's factual findings are objectively unreasonable in light of the evidence presented in the state-court proceeding. *See Eley*, 712 F.3d at 846 (internal quotations omitted).

All of the claims here assert that trial or appellate counsel were constitutionally ineffective. In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court articulated the test for demonstrating an ineffective assistance of counsel claim. First, the petitioner must show that, considering all of the circumstances, counsel's performance fell below an objective standard of reasonableness. *See id.* at 688; *see also Ross v. Varano*, 712 F.3d 784, 798 (3d Cir. 2013). To satisfy this first prong of *Strickland,* a petitioner must identify acts or omissions that allegedly fell below standards of reasonable professional judgment. *See Strickland*, 466 U.S. at 690. Second, a petitioner must

8

affirmatively demonstrate that any errors resulted in prejudice. Prejudice will be found only where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

As stated above, the PCR court's application of Supreme Court precedent must have been not merely erroneous, but unreasonable. Accordingly, it is not enough to show that defense counsel's performance fell below *Strickland*'s two-part standard. In a habeas case, a state court must be granted more deference and latitude than would apply on direct review of a conviction. *See id.*; *Renico v. Lett*, 559 U.S. 766, 773 (2010); *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). So even if this Court disagreed with the state courts' application of *Strickland*, it could not grant Pichardo's petition based on mere legal error. To meet the "unreasonable" standard, the error must be one that is not "susceptible to debate among reasonable minds." *See Wright v. West*, 505 U.S. 277, 291 (1992) (quoting *Butler v. McKellar*, 494 U.S. 407, 415 (1990)).

I discuss Mr. Pichardo's claims in light of those standards: first, ineffective assistance of appellate counsel as to sentencing issues (Sections IV.B & C); second, ineffective assistance of appellate counsel as to suppression and evidentiary issues (Section IV.D); and third, ineffective assistance of trial counsel (Section IV.E). I grant relief only as to the first: ineffective assistance of appellate counsel for failure to raise the aggravating factor/double counting issue in relation to sentencing (Section IV.B). The petition is otherwise denied.

## B.  Ineffective Assistance of Appellate Counsel: Aggravating Factor 1 and "Double Counting"

Pichardo argues that counsel was ineffective because he failed to argue on direct appeal that Judge Subryan erred in applying aggravating factor 1. (Ground Three; *see* ECF No. 1 at 9-11.) Primarily, Pichardo argues that the application of aggravating factor 1 constituted impermissible "double counting," because

aggravating factor 1 (committing crime in an especially "heinous, cruel, or depraved manner"), rests on facts already essential to the offense of conviction—aggravated manslaughter. (*See* ECF No. 1 at 5.) Because that error of state law would have required reversal of his sentence, he says, counsel was ineffective for failing to press it on appeal.

## 1.  Judge Subryan's findings and procedural background

Judge Subryan, at sentencing, applied statutory aggravating factor 1: "The nature and circumstances of the offense, and the role of the actor therein, including whether or not it was committed in an especially heinous, cruel, or depraved manner." N.J. STAT. ANN. § 2C:44-1(a)(1).[4] For finding that this offense was committed in an especially heinous and cruel manner, Judge Subryan gave the following justification:

> Number one, nature and circumstances of the offense and the role of the actor, including the fact that this was committed in the heinous, cruel manner. I am cognizant of the fact that our Appellate Courts and Supreme Court have said that this could be tantamount to double counting, but I particularly find this factor because of the circumstances and the weapon used on the night in question. This was a weapon designed to kill at tremendous distance. He knew what he had. He bought it. He had it a month before. He knew what he had. The testimony was he peered through the scope before pulling that trigger. That weapon, in this Court's opinion and judgment, makes it necessary that I find that aggravating factor.

(*See* ECF No. 9-16 at 26) (emphasis added).

On direct appeal, Mr. Pichardo's appellate counsel did not raise this aggravating factor/double counting argument. Appellate counsel asserted only two points:

---

4        As noted above, N.J. STAT. ANN. § 2C:44-1(1) takes into account "[t]he nature and circumstances of the offense, and the role of the actor therein, including whether or not it was committed in an especially heinous, cruel, or depraved manner." Judge Subryan also applied aggravating factors 3 and 9. Section 2C:44-1(3) (specific deterrence) assesses the "risk that the defendant will commit another offense," and § 2C:44-1(9) (general deterrence) is meant to "[deter] the defendant and others from violating the law."

I. THE TRIAL COURT ERRED IN FAILING TO ENTER A JUDGMENT OF ACQUITTAL SUA SPONTE REGARDING THE CHARGE OF MURDER EMBODIED IN COUNT I, THEREBY NECESSARILY TAINTING THE JURY'S VERDICT FINDING THE DEFENDANT GUILTY OF THE LESSER INCLUDED OFFENSE OF AGGRAVATED MANSLAUGHTER;

II. THE SENTENCE IMPOSED WAS MANIFESTLY EXCESSIVE.

Deciding that direct appeal, the Appellate Division rejected both grounds with fairly minimal discussion. (*See* ECF No. 9-19 at 45–47.)

In the PCR proceeding, Pichardo asserted that appellate counsel's selection of those two grounds, but not others, constituted ineffective assistance.[5] The trial-level PCR court, without detailed discussion, denied all claims of ineffective assistance of appellate counsel. (ECF No. 9-18 at 30–31.) The Appellate Division, on review of the denial of PCR, ruled that this claim, one of several raised by Pichardo in a supplemental *pro se* brief, was "without sufficient merit to warrant discussion in a written opinion." (ECF No. 9-22 at 3, 13.) The New Jersey Supreme Court denied certification. (*See* ECF No. 9-23.)[6]

---

[5]    The PCR transcript is somewhat vague as to what grounds appellate counsel was alleged to have omitted. Reference is made to a list in a letter or *pro se* brief, but the list is not quoted. On appeal from the denial of PCR, the Appellate Division explicitly cited (and rejected) this "double counting" claim of ineffective assistance (ECF No. 9-22 at 3), corroborating the petitioner's contention that he had raised it below. Respondent, for its part, admits that this specific ground was raised in PCR proceedings at the trial level. (Answer, ECF No. 10 at 2 ("Par. 11. Agreed, as to all subparagraphs")) Respondent also explicitly "waives any possible exhaustion argument." (*Id.*)

[6]    AEDPA requires this court to defer to a state court's determination, even where that determination is a summary one. *See Harrington*, 562 U.S. 99 (holding that an unexplained Order is to be treated as "on the merits in the absence of any indication or state-law procedural principles to the contrary"); *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) (finding that a state court's determination that a claim is meritless demands deference as long as fairminded jurists could disagree on the correctness of the decision). Where a summary appellate denial was preceded by a reasoned decision by the lower court, the habeas court will typically "look through" to the reasoning of the lower court decision. *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991) ("…courts generally … affirm[] without further discussion when they agree, not when they disagree, with the reasons given below"). Here, however, neither court discussed its decision. Hence,

11

## 2. *Strickland* as applied to counsel's failure to raise an issue on State direct appeal

The two-part *Strickland* test applies not just to counsel's representation at trial, but to representation on direct appeal as well. *See Smith v. Robbins*, 528 U.S. 259, 285, 120 S. Ct. 746 (2000); *Evitts v. Lucey*, 469 U.S. 387, 393–94, 105 S. Ct. 830 (1985). Appellate counsel's conduct will therefore be measured against the two-part *Strickland* test of (1) deficient representation and (2) prejudice. The claim here is that counsel failed to raise the aggravating factor/double counting issue on direct appeal. Counsel, of course, does not violate professional standards by exercising broad discretion to select issues for appeal; it can be unreasonable, however, for appellate counsel to skip an issue that had merit, while pursuing one that did not. If so, *Strickland* "prejudice" then requires a reasonable probability that the forgone issue would have prevailed on appeal. (Those standards are discussed further in sections IV.B.3 & 4, *infra*.)

When considering a habeas claim of ineffective assistance on a State appeal, it is important to separate the various levels of review. The ruling of "federal law" to which this Court must defer under 28 U.S.C. § 2254(d)(1) is the PCR court's application of *Strickland*. To obtain relief, then, Mr. Pichardo would have to demonstrate that the PCR court "unreasonably applied" the two-part *Strickland* standard, as set forth in the footnote.[7] The state PCR court, however,

---

although I defer to the state court's ultimate decision, there is no substantial statement of reasons on which I may rely.

[7]      As is customary, the defendant litigated his ineffective assistance claim in PCR proceedings, not on direct appeal. There is no contention that the PCR court's decision was "contrary to" *Strickland,* in the sense that the court misidentified or ignored that case. The claim must be that the state PCR court unreasonably applied *Strickland.* Judge Hillman of this Court has usefully summarized the "unreasonable application" standard thus:

> A state court decision "involve[s] an unreasonable application" of federal law "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," and may involve an "unreasonable application" of federal law "if the state court either unreasonably extends a

was required to assess counsel's performance *in the context* of state substantive law and state law standards of review. So this Court must, in a sense, think like a New Jersey appellate court—but subject that thinking to the rigors of the *Strickland* test and habeas deference.

As I have perhaps already suggested, the special context of ineffective assistance of appellate counsel can lead a reviewing habeas court down some conceptual blind alleys. I mention two.

It is axiomatic that a federal habeas court corrects errors of federal law, not state law. *See* 28 U.S.C. § 2254(d)(1); *Estelle v. McGuire*, 502 U.S. 62, 67–68, 112 S. Ct. 475, 480 (1991). That principle, however, is premised on the primary role of the State appellate courts in correcting error. Where that role has been

---

legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply," (although the Supreme Court expressly declined to decide the latter). *Id.* at 407–09. *See also Moore v. DiGuglielmo*, No. 09–2189, 489 F. App'x 618, 624 n. 2 (3d Cir.2012) (noting the same). To be an "unreasonable application" of clearly established federal law, the state court's application must be objectively unreasonable. [citing *Williams v. Taylor*, 529 U.S. 362, 409, 120 S. Ct. 1495 (2000)]. "This standard ... is 'difficult to meet': To obtain habeas corpus relief from a federal court, a state prisoner must show that the challenged state-court ruling rested on 'an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Metrish v. Lancaster*, — U.S. —, — – —, 133 S. Ct. 1781, 1786–87, 185 L.Ed.2d 988 (2013) (quoting *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 786–87, 178 L.Ed.2d 624 (2011)).

The "clearly established Federal law" referred to in § 2254(d)(1) consists of the U.S. Supreme Court precedents at the time of the state court decision adjudicating the petitioner's claims. *Greene v. Fisher*, —— U.S. ——, 132 S. Ct. 38, 181 L.Ed.2d 336 (2011). In determining whether the state court's application of Supreme Court precedent was objectively unreasonable, however, a habeas court may consider the decisions of inferior federal courts. *Matteo v. Superintendent*, 171 F.3d 877, 890 (3d Cir. 1999), cited in *Glenn v. Wynder*, No. 12–4333, 2014 WL 642947, *5 n. 6 (Feb. 20, 2014) and *Hardcastle v. Horn*, 368 F.3d 246, 256 n. 3 (3d Cir. 2004).

*Almodovar v. Hauck*, No. CIV.A. 11-5086 NLH, 2014 WL 4931276, at *4 (D.N.J. Oct. 1, 2014).

compromised by ineffective assistance, the habeas court must determine (*inter alia*) whether the issue, *if* properly presented to the State appellate court, *would have* induced that State court to reverse or remand. That determination necessarily enmeshes the federal court in the issues of state law and procedure that the state court would have considered.

Likewise, the habeas statute provides that State court errors of fact will be corrected only in egregious cases. *See* 28 U.S.C. § 2254(d)(2). But we must be clear about what factual findings we mean. The habeas claims here do not, strictly speaking, call upon me to overturn the trial court's factual findings at sentencing; instead, I must assess the likelihood that, absent counsel's errors, *the Appellate Division* would have overturned them. Or rather, after granting proper deference, I must determine whether it was unreasonable for the PCR court to conclude that the Appellate Division would *not* have overturned such findings.

This Court's assessment of effective representation, and especially of prejudice, thus requires it to stand in the shoes of the state appellate court, applying state law standards of appellate review and state substantive law. That hypothetical state appeal, in effect a *gedankenexperiment,* provides the backdrop for the ultimate issue: whether the State PCR court "unreasonably applied" federal law, *i.e., Strickland,* or unreasonably found the facts in connection with that ineffective assistance claim.

### 3.   *Strickland* prong one: unreasonableness of decision to forgo the aggravating factor issue on direct appeal

I first examine whether counsel's failure to raise the aggravating factor/double counting issue on direct appeal fell below an objective standard of reasonableness. *See Strickland,* 640 U.S. at 699. Under the first prong of *Strickland,* deficient performance may be found where counsel has failed to raise a viable issue on appeal. Of course, appellate counsel does not render

substandard assistance by failing to raise every nonfrivolous matter. *See Jones v. Barnes*, 463 U.S. 745 745 (1983). To the contrary, counsel "decides which issues to pursue on appeal ... and there is no duty to raise every possible claim. An exercise of professional judgment is required." *Sistrunk v. Vaughn*, 96 F.3d 666, 670 (3d Cir. 1996) (citing *Jones*, 463 U.S. at 751 (1983)). Indeed, "the 'process of winnowing out weaker arguments on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy.'" *Id.* (quoting *Smith v. Murray*, 477 U.S. 527, 536 (1986)). Thus a petitioner must "show that his appellate counsel's failure to raise the [] argument on appeal fell outside the wide range of reasonable professional assistance; that is, [he would have to] overcome the presumption that, under the circumstances, the challenged action 'might be considered sound [appellate] strategy.'" *Buehl v. Vaughn*, 166 F.3d 163, 173 (3d Cir. 1999) (quoting *Strickland*, 466 U.S. at 689; [bracketed] language is in *Buehl*).

That presumption of sound strategy may be overcome, however, where the omitted issue is "clearly stronger" than those that were presented on appeal. *Robbins*, 528 U.S. at 288. The case law is not clear as to what constitutes a "clearly stronger" argument. At a minimum, however, an omitted argument is "clearly stronger" when it has considerable merit and the arguments actually presented had little or none. *See id.*; *Showers v. Beard*, 635 F.3d 625, 634 (3d Cir. 2011).

The two grounds that Mr. Pichardo's counsel did raise on direct appeal were quite weak. (ECF No. 9-19 at 45–47.) The first was that so-called "overcharging" (*i.e.,* unwarranted submission of the murder charge to the jury) smoothed the way for a compromise verdict of aggravated manslaughter. The Appellate Division rejected this claim for three reasons: (1) trial counsel had not preserved it by moving at trial for a judgment of acquittal; (2) the evidence of intent was not so clearly lacking that the court should have withdrawn the murder charge from the jury *sua sponte*; and (3) the argument that

"overcharging" required reversal rested on case law that had been overturned by the New Jersey Supreme Court.[8] (*See* ECF No. 9-19 at 45–47.) The second ground for appeal, that the sentence was manifestly excessive, was quickly rejected without discussion. (*Id.* at 45)[9]

The grounds actually raised on direct appeal, then, were quite weak. To demonstrate ineffective assistance, however, Pichardo must show more: he must demonstrate that the arguments appellate counsel did *not* make were "clearly stronger" than those he did. *See* p. 15, *supra* (citing, *e.g., Robbins*, 528 U.S. at 288).

I therefore consider the strength of the forgone aggravating factor/double counting issue. Appellate counsel was clearly on notice that double counting was at least a potential issue; Judge Subryan himself signaled that, in applying aggravating factor 1, he was perhaps stretching the boundaries of the

---

[8]    The reference is to *State v. Wilder*, 939 A.2d 781 (N.J. 2008). Former case law, reversed by *Wilder*, set a low bar for reversal, equating prejudice with a "real possibility" of a compromise verdict. *Id.* at 786 (citing *State v. Christener*, 362 A.2d 1153 (N.J. 1976)). *Wilder* established that there is no special, lower standard of review for a "jury overcharge" claim. Such a claim will be reviewed like any other—*i.e.*, the error will be disregarded unless "clearly capable of producing an unjust result." N.J. Ct. R. 2:10-2. The *Wilder* court opined, and seemingly intended, that "few jury-overcharge cases would meet the 'unjust result' standard." 939 A.2d at 793.

[9]    A manifestly excessive sentence is one that runs afoul of the appellate court's residual power to reverse or remand where a sentence, although it conforms to the procedural requirements of the Code, nevertheless "shocks the judicial conscience." *State v. Cassady*, 966 A.2d 473, 482 (N.J. 2009); (quoting *State v. O'Donnell*, 564 A.2d 1202, 1205 (N.J. 1989)). Such claims, though routinely raised, almost never succeed; indeed, they rarely even make it into published decisions. A Westlaw search for "manifestly excessive sentence" revealed that, in the last year, the Appellate Division has denied such claims in some 20 opinions, all of them unreported, generally without extensive discussion. While those cases include some limited remands, the grounds are not excessiveness *per se,* but rather failure to consider a relevant factor, or some other more specific error.   In short, this catchall claim, commonly tacked onto appellate briefs as the final point, did not present a promising issue—particularly where, as here, the sentence imposed was two years above the middle of the statutory 10–30 year range.

16

permissible: "I am cognizant of the fact that our Appellate Courts and Supreme Court have said that this could be tantamount to double counting ...." (ECF No. 9-16 at 26) Mr. Pichardo argues that appellate counsel should have raised that issue on appeal, because it had far more chance of prevailing than the two points counsel did raise. I agree.

Under the State system, each offense or grade of offense has a statutory sentencing range (in the case of aggravated manslaughter, 10 to 30 years). Within that range, the sentencing judge applies aggravating and mitigating factors to arrive at a sentence. New Jersey has been clear about its determination to rein in disparities in sentence. Indeed, the "double-counting" prohibition was a component of that effort; "double-counting of elements of the offenses as aggravating factors would be likely to interfere with the Code's dedication to uniformity in sentencing." *State v. Kromphold*, 744 A.2d 640, 644-45 (N.J. 2000).

Accordingly, sentencing in general, and the application of aggravating and mitigating factors in particular, is an appellate minefield. Federal practitioners will find something familiar, for example, in the appellate activity that followed the State's abandonment of the mandatory "presumptive sentence" system. That abandonment is closely analogous to, and indeed was based on, the federal courts' abandonment of the mandatory aspect of the federal Sentencing Guidelines. *Compare United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738 (2005), *with State v. Natale*, 878 A.2d 724 (N.J. 2005). *See* discussion at Section III.C, *infra.*

The obligations of a New Jersey sentencing judge are many, complex, and varied. A sentencing judge "shall" consider certain aggravating and mitigating factors, in each instance numbered 1 through 13. N.J. STAT. ANN. § 2C:44-1(1)(a) & (b). "Each factor found by the trial court to be relevant must be supported by 'competent, reasonably credible evidence.'" *State v. Fuentes*, 85 A.3d 923, 931–32 (N.J. 2014) (quoting *State v. Roth*, 471 A.2d 370, 386 (N.J. 1984)). The Court Rules require that the sentencing court explain the reasoning behind its

findings, N.J. Ct. R. 3:21–4(g); failure to articulate an adequate explanation may in itself require a remand for resentencing. *See State v. Bieniek*, 985 A.2d 1251, 1255 (N.J. 2010). For example, "a remand may be required when a reviewing court determines that a sentencing court failed to find mitigating factors that clearly were supported by the record. *State v. Dalziel*, 867 A.2d 1167 (N.J. 2005) (concluding that aggravating and mitigating factors supported by record 'must be a part of the deliberative process')." *Id.*

The former system of mandatory "presumptive sentences," generally falling around the middle of the range, has been abolished. Now a sentencing judge may, but is not required to, use "the middle of the sentencing range as a logical starting point for the balancing process" of aggravating and mitigating factors. *Fuentes*, 85 A.3d at 932 (quoting *State v. Natale*, 878 A.2d 724, 740 (N.J. 2005) (invalidating the mandatory "presumptive sentence" system)). "[R]eason suggests that when the mitigating factors preponderate, sentences will tend toward the lower end of the range, and when the aggravating factors preponderate, sentences will tend toward the higher end of the range." *Id.*

In Mr. Pichardo's favor was one mitigating factor (that he had been a law abiding citizen for a substantial period of time); against him were three aggravating factors (specific deterrence, general deterrence, and the commission of the offense in a cruel and heinous manner). The resulting sentence was 22 years—2 years above the midpoint of the range. I note that the two deterrence factors are fairly generic; it is reasonable to conclude that aggravating factor 1, the "cruel and heinous" commission of the offense, did most of the work in raising Pichardo's sentence.

The trial court's balancing of aggravating and mitigating factors is discretionary, but there are some legal constraints. The New Jersey Supreme Court has held, for example, that an aggravating factor must be premised upon facts independent of the elements of the crime itself. *Fuentes*, 85 A.3d at 926; *see also State v. Link*, 485 A.2d 1069, 1071 (N.J. Super. App. Div. 1984) (where an

18

essential element of a crime is a specific fact, that element may not be used as an aggravating factor to extend a custodial sentence under the former "presumptive term" system). Thus, "when intent is an element of an offense, it may not be considered as an aggravating factor." *State v. O'Donnell*, 564 A.2d 1202, 1206 (N.J. 1989). In particular, a court considering aggravating factor 1 ("heinous, cruel, or depraved") must avoid "double-counting" facts that are inherent in the offense itself. *See State v. Kromphold*, 744 A.2d 640, 644 (N.J. 2000).[10] Were it otherwise, "every offense arguably would implicate aggravating factors merely by its commission, thereby eroding the basis for the gradation of offenses and the distinction between elements and aggravating circumstances." *Id.* at 645.

Aggravating factor 1, then, must rest on facts that depart from, or exceed, the elements of the offense. As to offenses on the continuum from manslaughter to murder, death is a given. As a matter of law, the death of the victim cannot do

---

[10]     The clearest examples are cases in which the aggravating factor literally duplicates an element of the offense. *Kromphold* cited a number of such cases:

> In *State v. Pineda*, 119 N.J. 621, 627–28, 575 A.2d 855 (1990), we held that because death was an element of the crime of death by auto, N.J.S.A. 2C:11–5(b), the victim's death could not be considered as an aggravating factor for sentencing purposes. Similarly, in [*State v. Jarbath*, 555 A.2d 559, 564 (N.J. 1989)], we held that to consider a child's death as support for the seriousness-and-gravity-of-harm aggravating factor constituted impermissible double-counting because "the death of the child itself was an element of the offense of second-degree manslaughter." *See also* [*State v. Pillot*, 560 A.2d 634 (N.J. 1989)] (holding that where use of BB gun elevated robbery from second-degree to first-degree crime, use of weapon could not be considered aggravating factor for sentencing purposes); *State v. Yarbough*, 195 N.J. Super. 135, 143, 478 A.2d 432 (App.Div.1984) (holding that where age of victim is factor that makes sexual assault against her crime of first degree, victim's age may not be used as aggravating factor), *remanded for resentencing on other grounds*, 100 N.J. 627, 645–46, 498 A.2d 1239 (1985), *cert. denied*, 475 U.S. 1014, 106 S. Ct. 1193, 89 L.Ed.2d 308 (1986); *State v. Link*, 197 N.J. Super. 615, 620, 485 A.2d 1069 (App. Div.1984) (holding that where victim's status as police officer was essential element of offense, that status could not be used as aggravating factor for sentencing purposes), *certif. denied*, 101 N.J. 234, 501 A.2d 911 (1985).

*Kromphold*, 744 A.2d at 645.

double duty as an aggravating factor. *See State v. Jarbath,* 555 A.2d 559, 564 (N.J. 1989). Aggravating factor 1 may be applied, however, to especially "cruel" conduct. Analogizing to an aggravating factor for capital murder, *O'Donnell* required that the defendant intended "to inflict pain, harm and suffering—*in addition to* intending death." *O'Donnell,* 564 A.2d at 1206 (emphasis added).

Was Mr. Pichardo's killing of EW especially cruel or heinous in a manner that exceeded what is inherent in his conviction for aggravated manslaughter? Very arguably not. Aggravated manslaughter requires a showing that the defendant "recklessly cause[d] death under circumstances manifesting extreme indifference to human life." N.J. STAT. ANN. § 2C:11–4(a)(1). To avoid double counting, aggravating factor 1 would have to be based on something over and above (1) the death of the victim and (2) the defendant's recklessness and extreme indifference to human life, which are inherent in the offense. Judge Subryan's findings did not establish cruelty beyond that inherent in the offense itself. Double counting was a meritorious appellate issue; indeed, as argued in the following section, it was potentially a winning issue.

In short, the argument that Judge Subryan impermissibly assessed aggravating factor 1 against Mr. Pichardo has considerable merit, but the arguments that counsel actually presented on appeal had little.

In the face of such a disparity, the courts have found that appellate counsel's failure to raise an issue fell below an objective standard of reasonableness. Thus, for example, in *Showers v. Beard, supra,* trial counsel failed to secure an expert to support the defense that the victim was not poisoned, but rather committed suicide by ingesting a toxic liquid form of morphine known as Roxanol. Defense counsel elicited some testimony that Roxanol had a bitter taste that an unknowing victim would have detected. He did not, however, call a qualified expert to establish that the taste could not easily be masked. Counsel's omission, said the *Showers* court, could have furnished meritorious grounds for appeal, but appellate counsel did not raise it: "[C]ounsel

20

ignored an argument going directly to the issue of guilt that is clearly stronger than those presented. For example, appellate counsel included an argument challenging the sufficiency of the evidence, which rarely prevails." 635 F. 3d at 634.

As I must, I give due deference to the denial of Mr. Pichardo's claim (albeit without extensive analysis) by the Appellate Division. Nevertheless I find that there is a wide disparity between the two weak issues that appellate counsel did pursue and the meritorious aggravating factor/double counting issue that he did not pursue. Appellate counsel's decision to forgo the double counting issue, while pressing two nearly hopeless issues, fell below an objective standard of reasonableness. Pichardo's claim satisfies the first prong of *Strickland* and *Smith.*

### 4.   *Strickland* **prong two: Prejudice**

I move to the second prong of the *Strickland* analysis: prejudice. That prejudice prong has a particular application to ineffective assistance on direct appeal. The petitioner has the burden to "show a reasonable probability that, but for his counsel's unreasonable failure to [argue the omitted issue], he would have prevailed on his appeal." *Smith,* 528 U.S. at 285. On appeal, to "prevail" means to establish a non-harmless error that results in reversal or remand.

The issue here is a sentencing issue. For purposes of the *Strickland* prejudice analysis, sentencing errors are salient, "because 'any amount of [additional] jail time has Sixth Amendment significance.'" *Lafler v. Cooper,* __ U.S. __, 132 S. Ct. 1376, 1386 (2012) (quoting *Glover v. United States,* 531 U.S. 198, 203, 121 S. Ct. 696 (2001)). So we are not presented with the typical case of ineffective assistance at trial, where any error must be weighed against other evidence of guilt; a sentencing error *is* a prejudicial "outcome" for *Strickland* purposes. "Prejudice" here, then, requires a reasonable probability that the State appellate courts would have reversed and remanded the case for resentencing without aggravating factor 1.

### a. Appellate Division standard of review of sentencing error

Initially, *Strickland*'s "reasonable probability" depends on the standard of review that the State appellate court would have applied. With respect to sentencing, that standard of review received its classic statement in *State v. Roth*:

> First, we will always require that an exercise of discretion be based upon findings of fact that are grounded in competent, reasonably credible evidence.
>
> Second, we will always require that the factfinder apply correct legal principles in exercising its discretion....
>
> Third, we will exercise that reserve of judicial power to modify sentences when the application of the facts to the law is such a clear error of judgment that it shocks the judicial conscience. We anticipate that we will not be required to invoke this judicial power frequently.

471 A.2d 370, 386 (N.J. 1984) (citations omitted).

Under *Roth,* the Appellate Division would have reviewed the factual findings underlying the trial judge's application of aggravating factor 1 only to ensure they were "grounded in competent, reasonably credible evidence." *Id.* Mr. Pichardo's aggravating factor/double counting contention, however, is in many respects an issue of law. And the question of whether the sentencing court applied "correct legal principles" would have received plenary review.

All of the foregoing is subject to the principle that an error, if found, will not require reversal if it is harmless.[11] Under New Jersey practice, an error at trial will be found harmless "unless it is of such a nature as to have been clearly capable of producing an unjust result." N.J. Ct. R. 2:10-2.[12]

---

[11]    Like the federal courts, the New Jersey courts distinguish between "trial errors," which are subject to harmless error analysis, and "structural" errors, which go to the very integrity of the trial process and require automatic reversal. *See State v. Camacho,* 95 A.3d 635, 643 (N.J. 2014) (citing *Arizona v. Fulminante,* 499 U.S. 279, 307, 309, 111 S. Ct. 1246, 1263, 1265 (1991)). The errors claimed here do not fit in that narrow category of structural errors.

[12]    That standard is a protean one, varying with the circumstances. Parenthetically,

### b. Is there a reasonable probability that the Appellate Division would have overturned the sentencing judge's fact finding as to aggravating factor 1?

The trial judge concluded for purposes of aggravating factor 1 that the offense was committed in a particularly cruel and heinous manner. That conclusion rested on two facts:

(1) As the defendant knew, the weapon was a rifle with a laser scope, designed to kill at a tremendous distance; and

(2) the defendant peered through the scope when firing.[13]

Under *Roth*, the Appellate Division would have considered whether those two

---

and without deciding the matter, I note that in criminal trials this standard may require that harmlessness be demonstrated beyond a reasonable doubt. The New Jersey Supreme Court, in perhaps the leading case on harmless error, has stated that it is "not at all sure the test in *Chapman* [*i.e.,* harmless beyond a reasonable doubt] is discernibly different from our measure for reversible error [*i.e.,* clearly capable of producing an unjust result], despite the differences in phrasing." *State v. Macon,* 273 A.2d 1, 6 (N.J. 1971) (material in [brackets] added; citing *Chapman v. California,* 386 U.S. 18, 87 S. Ct. 824 (1967) ("harmless beyond a reasonable doubt" standard for constitutional trial errors)). Justice Weintraub, emphasizing that the determination was a sensitive, case-specific one, wrote for the Court that "[a] judge would hardly insist an error, 'constitutional' or other, was 'harmless' if he found a 'reasonable' doubt as to whether the error contributed to the result." *Macon,* 273 A.2d at 9. The Appellate Division has continued to cite *Macon* for the proposition that error, even where not objected to at trial, will be found harmless only if is not sufficient to raise "a reasonable doubt" as to whether it altered the jury's verdict. *See, e.g., State v. Morgan,* 33 A.3d 527, 534 (N.J. Super. App. Div. 2011), *aff'd,* 84 A.3d 251 (N.J. 2013); *State v. Brooks,* 706 A.2d 757, 767 (N.J. Super. App. Div.), *certif. denied,* 718 A.2d 1215 (N.J. 1998).

13    The entire finding, quoted here for ease of reference, was as follows:

> Number one, nature and circumstances of the offense and the role of the actor, including the fact that this was committed in the heinous, cruel manner. I am cognizant of the fact that our Appellate Courts and Supreme Court have said that this could be tantamount to double counting, but I particularly find this factor because of the circumstances and the weapon used on the night in question. This was a weapon designed to kill at tremendous distance. He knew what he had. He bought it. He had it a month before. He knew what he had. The testimony was he peered through the scope before pulling that trigger. That weapon, in this Court's opinion and judgment, makes it necessary that I find that aggravating factor.

(*See* ECF No. 9-16 at 26) (emphasis added).

findings were supported by competent, reasonably credible evidence.

The first finding was supported by substantial evidence. The defendant admitted that he knowingly possessed the rifle, which had been stolen from its owner three weeks earlier. The rifle was a 9 mm weapon, pistol caliber but quite lethal. It is inferable that the defendant knew the rifle had a scope. (I discuss the operability of the scope in relation to the second finding.)

The sentencing judge, who explicitly based aggravating factor 1 on "[t]hat weapon," was clearly affected by the weapon's accuracy, and expressed a palpable distaste for the gun itself. (ECF No. 9-16 at 23)("one of the most evil-looking weapons I've seen"). The State's firearms expert, however, stated that the gun was nothing special. Defense counsel asked if it was a "sophisticated" weapon, and asked the expert whether it was more analogous to a high performance aircraft or a Piper Cub. The expert replied that it was "[c]loser to a Piper Cub." (ECF No. 9-10 at 27)

The second finding, in both its literal truth and its implications, was more problematic, for several reasons. By finding that Pichardo looked through the scope of this weapon, which was "designed to kill at a tremendous distance," the court implied that Pichardo took advantage of the rifle's advanced capabilities to hit precisely the distant target that he was aiming at: EW's head, in the car.

The evidence that the scope was operable on the night of the shooting was equivocal. Three weeks before, it was operable. Three weeks later, it was not, possibly as a result of a dead battery. As Judge Subryan pointed out during the course of the trial, "the State did not produce any evidence showing that [the scope] was working on the 28th." (ECF No. 9-10 at 82.) He found, however, that the scope met the minimal threshold of relevance, and admitted it in evidence. (*See* discussion at Section IV.D.2, *infra*.) At trial, a fresh battery was inserted for demonstrative purposes. But whether there was "competent, reasonably credible evidence" permitting a fact finder to conclude that the scope was working on the

night of the shooting is another matter.[14]

Second, the "testimony [that Pichardo] peered through the scope before pulling that trigger"—and the related implication that Pichardo specifically intended to kill EW—was shaky. There was only one piece of "testimony" that arguably fit that description. RV, one of the partygoers who traveled from Hawthorne to River Street in Paterson, intent on revenge for the beating, was riding in one of the cars when the shooting occurred. RV first testified that "I'm not sure if [Pichardo] was aiming." Pichardo, he testified, just held the gun up and shot it. During an exchange between counsel and the court, RV interrupted to explain that while testifying, RV had, through his hand gestures, mimed "looking through a peek hole." RV asked to explain himself further, but the court cut him off, telling him to wait for the "next question."[15] There was no further

---

[14]     The jury's rejection of the murder charge tends to suggest that it did not accept that the scope was operating on the night of the shooting. As Judge Falcone, in the PCR proceeding, explained it:

> So, even the scope issue, State's position with the scope, was he was never going to miss with a scope. You don't miss with a scope unless you're blind. So, even the issue about the scope being allowed in evidence didn't seem to have the impact that the State was hoping, because the jury in this case found that the behavior of Mr. Pichardo was, in fact, reckless.

(ECF No. 9-18 at 28) This issue is discussed further at Section IV.D.2, *infra*.

[15]     Here is the entire exchange:

Q.     What did you see?

A.     I think it was a shot gun or a rifle, something like that.

Q.     Do you remember what color it was?

A.     Black.

Q.     Did you see what this person did with it?

A.     Used it.

Q.     How did this person use it?

A.     Well, I'm not sure if he was aiming but he shot it.

Q.     What did you see him do with the rifle?

A.     Put it up, shoot it.

exploration of the issue. Based solely on the position of the witness's hands, the, the trial court concluded that there was "testimony" suggesting that Pichardo aimed the gun—when RV had explicitly, orally testified that he wasn't sure.

As the PCR court put it, the State's theory was that the killing was intentional, because a shooter employing an operational red dot scope almost cannot miss. (ECF No. 9-18 at 28) ("[H]e was never going to miss with a scope. You don't miss with a scope unless you're blind.") Of course, with the first shot Pichardo did miss, but the second shot, tragically, hit and killed EW. But even on the assumption that Pichardo looked through the scope—and the evidence of that is thin—the facts are consistent with the scope's not having been operational at the time.[16]

---

| Q. | You're going to have to do that again so I can describe it for the record. Okay. You made a gesture with two hands up in the air. You put the head tilted downwards. |
|---|---|
| MR. GEIST: | Could your Honor do this? |
| THE COURT: | Yes. The record will reflect the witness has placed both hands, one in front of the other in front of his face; is that correct, Mr. Vacca? |
| THE WITNESS: | Yes, sir. |
| MR. GEIST: | And turned his face away. |
| THE COURT: | No, he did not. I didn't see that. |
| THE WITNESS: | No, I was like looking like a little peek hole. |
| THE COURT: | Witness indicated he was holding both hands in front of his face. |
| THE WITNESS: | Yeah, yeah. |
| THE COURT: | Please. In front of his face and was your words, you said looking through a peek hole? |
| THE WITNESS: | Yes. May I – |
| THE COURT: | No, wait for the next question. |

(ECF No. 9-8 at 19–20.)

[16]     In fact, the State's expert made it clear that a person's looking through the sight did not necessarily imply that the sight was operational. Even if the battery-powered features are off, "you can still look through it and still see the front sight." (ECF No. 9-10 at 29) The implication seems to be that a shooter could sight along the barrel, as with a

I find a real possibility that the Appellate Division—if counsel had presented the issue—would have found that the sentencing court's factual findings were not supported by competent, reasonably credible evidence. In the context of all the facts, that might or might not have sufficed to require a remand for resentencing. At the very least, however, by undermining that fact finding, counsel could have strengthened the argument that the sentencing judge misapplied the law.

### c.  Is there a reasonable probability that the Appellate Division would have found that the sentencing judge misapplied the law?

Judge Subryan applied the law to the facts and found that the State had established aggravating factor 1. In doing so, the judge honestly and conscientiously flagged a potential legal issue:

> I am cognizant of the fact that our Appellate Courts and Supreme Court have said that this could be tantamount to double counting, but I particularly find this factor because of the circumstances and the weapon used on the night in question.

(ECF No. 9-16 at 26). Surveying the Supreme Court and Appellate Division case law to which Judge Subryan was surely referring, I conclude that double counting was a meritorious issue here. If raised by counsel, that issue would have had a reasonable probability of success. It is likely that the Appellate Division would have remanded for resentencing.

"Double counting," as discussed above, refers to the finding of an aggravating factor based on matters already taken into account by the offense of conviction. *See* Section IV.B.3, *supra*, pp. 18-20. Aggravated manslaughter, the

---

traditional iron sight. *See* https://en.wikipedia.org/wiki/Iron_sights (citing merriam-webster.com – iron sight). Whether Pichardo did so, however, is speculative.

Mr. Pichardo, for his part, testified that he did not look through the scope, did not know how to turn it on, intended only to scare the people who were looking for revenge, and did not realize until later that his shot had hit anyone. (ECF No. 9-11 at 10, 12–13, 39.) Of course the sentencing court was not required to adopt Pichardo's version; it only needed to have sufficient evidence for the version it did adopt.

offense of conviction here, requires a showing that the defendant "recklessly cause[d] death under circumstances manifesting extreme indifference to human life." N.J. STAT. ANN. § 2C:11–4(a)(1). To avoid double counting, then, aggravating factor 1 "must be based on factors other than [1] the death of the victim and [2] the circumstances essential to support a finding that the defendant has acted with extreme indifference to human life." *Fuentes*, 85 A.2d at 933 ([bracketed] numbers added).

To be sure, as discussed above, a defendant's conduct may be similar in nature to the statutory elements of the offense, but nevertheless exceed them in cruelty. *Fuentes,* for example, held that "a sentencing court may justify the application of aggravating factor 1, without double-counting, by reference to the extraordinary brutality involved in an offense." 85 A.3d at 933. But to meet that deplorable standard, the offense must have been cruel in some extraordinary way. The defendant's conduct must have been intended "to inflict pain, harm and suffering—*in addition to* intending death." *O'Donnell*, 564 A.2d at 1206 (emphasis added). "Cruel," as used in aggravating factor 1, imports that "pain, either physical, psychological, or emotional is inflicted gratuitously or as an end in itself." *Id.* Finally, the sentencing court's finding must be specific and well supported: "[A]s the Appellate Division [has held], effective appellate review cannot be achieved when there is uncertainty whether the court meant that [the defendant's killing of the victim] was unusually brutal or cruel in nature." *Fuentes,* 85 A.3d at 934 (internal citations omitted).

I survey the cases. Aggravated manslaughter cases have upheld the application of aggravating factor 1 where the defendant, in addition to causing death, cruelly inflicted prolonged suffering:

In *State v. Lewis,* 538 A.2d 399 (N.J. Super. Ct. App. Div. 1988), for example, the defendant firebombed a house. He injured some of the seven occupants and killed one, a child. As his sentencing for aggravated manslaughter, the judge stated, "it's hard to imagine a more painful, dreadful

way to die." *Id.* at 403. The Appellate Division upheld the sentencing judge's application of aggravating factor 1.

In *State v. Soto*, 773 A.2d 739 (N.J. Super. Ct. App. Div. 2001), *overruled on other grounds*, *State v. Dalziel*, 867 A.2d 1167 (N.J. 2005), another aggravated manslaughter case, three defendants robbed the victim. In the resulting struggle, one of them attempted to duct tape the victim's mouth to muffle his screams. Meanwhile, another used the barrel of a shotgun to beat the victim, who died of massive cranial cerebral injuries. *Id.* at 743, 745. The Appellate Division, upholding the application of aggravating factor 1, quoted the trial judge: "[T]his was not just 'a shooting where the victim dies, boom in the old movies. This was brutal, and it went on for a long time.'" *Id.* at 754.[17]

Cases involving offenses other than aggravated manslaughter are analogous. They have upheld the application of aggravating factor 1 when the defendant tortured and terrorized the victim, or sadistically prolonged the victim's ordeal. Thus aggravating factor 1 has been affirmed against a defendant convicted of endangering the welfare of a child when the child was starved and "tortured" physically and emotionally, *State v. T.C.*, 789 A.2d 173, 188 (N.J.

---

[17]    One case that is at least superficially problematic for Mr. Pichardo's position is an unreported, non-precedential one: *State v. Williams*, 2014 WL 4175204 (N.J. Super. Ct. App. Div. Aug. 25, 2014). Without discussion, *Williams* upheld the application of aggravating factor 1 over defendant's objection that his crime lacked "'particular heinousness' because the victim of his shooting was not the intended victim and the incident was 'brief.'" *Id.* at *5. (The case does not, by the way, mention "double counting"; the issue may simply have been the applicability, or not, of aggravating factor 1.) There, however, the trial court found that the defendant and others had gotten into a gang-related altercation at a club; that the defendant got a ride home and retrieved a gun; that he returned to the club and lay in wait until his intended victim got into his car and locked his seat belt; and then "didn't pull the trigger once or twice, but ... emptied the weapon into the vehicle." *Id.* The shots injured the intended victim, and killed another occupant of the car. Mr. Pichardo, in contrast, did not lie in wait or "empty" his gun, but took two shots in the direction of one of two automobiles that had come to his street, seeking revenge for the earlier beating. For heinousness, *Williams*'s facts, I think, are distinguishable from those of this case. Or so a State appellate court could find, to the extent it considered *Williams* precedential at all. In any event, I do not think that *Williams* would outweigh the principles expressed in the other cases cited here.

Super. Ct. App. Div. 2002); in an aggravated assault case where the defendant police officers handcuffed the victim, suspended him off the ground, and severely beat him with night sticks, *O'Donnell*, 564 A.2d 1202; and in a sexual assault case where the defendant "held the victim hostage" for a day, *State v. Frost*, 577 A.2d 1282, 1292 (N.J. Super. Ct. App. Div. 1990).

Cases that reverse and remand on double counting grounds, like those that affirm, tend to fall in a pattern. Of course, conduct that is itself an explicit element of the offense cannot be double counted as an aggravating factor—quintessentially, the victim's death in a manslaughter or murder case. (*See, e.g.,* cases cited at n.10, *supra.*) In addition, however, aggravating factor 1 has been reversed when it rests on the *particular facts* that supported the aggravated grade of the offense—as to aggravated manslaughter, the "*circumstances essential to support a finding* that the defendant has acted with extreme indifference to human life," *Fuentes*, 85 A.2d at 933 (emphasis added).

For example, in *State v. Briggs*, 793 A.2d 882 (N.J. Super. Ct. App. Div. 2002), following a drunken argument on New Year's Eve, a woman "stabbed [her husband] once in the chest, piercing his heart." She pled guilty to aggravated manslaughter, stipulating to a 20-year minimum sentence. The court, clearly troubled by the quality of counsel's representation at the plea (and defendant's waiver of counsel at sentencing), as well as other factors, reversed and remanded. In doing so, it instructed the sentencing court to reconsider, *inter alia,* aggravating factor 1. It appeared that the defendant had stabbed the victim once, and then called 911. At the initial sentencing, there was no clear finding of "unusually brutal or cruel" conduct, *id.* at 887, beyond the fatal stabbing itself.

In *State v. Baum*, 2013 WL 3879904, at *14 (N.J. Super. Ct. App. Div. 2013),[18] a drunk driver ran over and killed two schoolgirls who were walking on the shoulder of the road. He was convicted of aggravated manslaughter, and the

---

[18]     *Baum* is non-precedential, but I think a state court would find it persuasive, because its reasoning consists largely of a block quotation from *Kromphold, supra.*

trial judge applied aggravating factor 1, because (1) the defendant was extraordinarily intoxicated, (2) he did not merely swerve, but drove on the shoulder as if it were a regular lane of automobile travel, despite his (inferable) knowledge that pedestrians from a nearby school used it as a walkway; and (3) he did not brake. The Appellate Division reversed, quoting *Kromphold, supra*:

> [T]he sentencing court double-counted the defendant's level of intoxication by supporting the first aggravating factor with the same evidence that the jury was authorized to consider in determining whether the State had proved "recklessness" or "circumstances manifesting extreme indifference to the value of human life."...Defendant's convictions of second-degree aggravated assault [pursuant to N.J.S.A. 2C:12–1b(1)] required a jury finding of recklessness that, pursuant to the trial court's instruction, could have been based on the jury's reliance on defendant's extraordinary level of intoxication. That jury finding, however, precluded the sentencing court from using defendant's level of intoxication as an aggravating factor.

*Id.* (entire paragraph quoted from *State v. Kromphold,* 744 A.2d 640, 646 (N.J. 2000)). The three facts relied on by the sentencing judge, said the Appellate Division, were also relied upon by the jury to find recklessness and circumstances manifesting an extreme indifference to human life. Indeed, the jury was instructed that it could so find based on those facts. To use the same facts as the basis for aggravating factor 1, then, would be double counting. *Baum* remanded for resentencing.

Here, Mr. Pichardo fired two shots at a moving vehicle, killing one person, and was convicted of aggravated manslaughter. The sentencing judge applied aggravating factor 1 based on the nature of the weapon and his conclusion that Pichardo peered through the scope. Aggravating factor 1 is based on particularly cruel and heinous conduct, not in relation to law-abiding conduct, but in relation to the violent offense of conviction. This killing was tragic and senseless, to be sure, but when the offense is aggravated manslaughter, the taking of life is a given. In an aggravated manslaughter case, the use of a lethal weapon does not strike me as extraordinary, but typical. There was nothing about using an

31

accurate weapon, or a "evil-looking" one, that rendered the offense more "cruel" than is typical. Judge Subryan neither found nor mentioned the "extraordinary brutality" that underlies aggravating factor 1. There was no evidence of sadistic infliction of pain for its own sake, terrorization, or prolongation of a victim's ordeal. EW was shot from behind, as the car drove away, and it seems that his death was immediate. This was the very "shooting where the victim dies, boom" that *Soto* implied would *not* support aggravating factor 1.

Like the extreme intoxication and other factors in *Baum* and *Kromphold*, the use of a weapon, or this particular kind of weapon, is not literally an element of aggravated manslaughter. But as in those cases, it was surely the basis for the jury's verdict of aggravated manslaughter—the very "circumstance[] essential to support a finding that the defendant has acted with extreme indifference to human life." *Fuentes*, 85 A.2d at 933. Shooting the gun at the car, with death resulting, was the conduct that made this an aggravated manslaughter, as opposed to some lesser offense. Firing in the direction of the occupied car was the gist of Pichardo's recklessness and was the circumstance that manifested an extreme indifference to human life. There was no other reckless conduct to which this could be considered an enhancement.[19]

For all of these reasons, I find a reasonable probability that, but for counsel's failure to argue Mr. Pichardo's meritorious point, Pichardo would have prevailed on his appeal and received a remand for resentencing. *See Strickland*, 466 U.S. at 694; *Smith*, 528 U.S. at 288.

Counsel's decision to forgo the double-counting claim fell below an objective standard of reasonableness and produced prejudice. The Appellate Division's summary denial of Mr. Pichardo's Sixth Amendment claim on appeal

---

[19]   At the very least, I think a State appellate court would find that Judge Subryan did not make an adequately clear finding. The finding he did make—based on the "weapon" and Pichardo's peering through the scope—is not clearly connected to brutality or cruelty.

from the denial of PCR was therefore an unreasonable application of *Strickland* and *Smith*.

Because the PCR court's application of *Strickland* was unreasonable, AEDPA deference loses its force, and I must consider the ineffective assistance claim anew. *See Branch v. Sweeney,* 758 F.3d 226, 233 (3d Cir. 2014) (citing, *inter alia, Panetti v. Quarterman,* 551 U.S. 930, 953, 127 S. Ct. 2842, 2858 (2007) ("When a state court's adjudication of a claim is dependent on an antecedent unreasonable application of federal law, the requirement set forth in § 2254(d)(1) is satisfied. A federal court must then resolve the claim without the deference AEDPA otherwise requires.") Based on the foregoing discussion, I find that appellate counsel's omission of the aggravating factor/double counting issue on appeal was ineffective, and that it caused prejudice.

I will therefore grant the habeas petition to this limited extent:

Mr. Pichardo's sentence is vacated, and this matter is remanded to the State court for resentencing. It is my intent to remand on the same terms that would have applied if effective counsel had prevailed on the appeal of the aggravating factor/double counting issue. Because sentencing is a delicate process, involving interdependent factors, the resentencing court must be free to rebalance the aggravating and mitigating factors. I express no view on what the revised sentence for aggravated manslaughter should be. This ruling does not implicate the consecutive four-year sentence for receiving stolen property.

## C. Ineffective Assistance of Appellate Counsel: *Blakely* claim

Mr. Pichardo argues that the three aggravating factors assessed against him by Judge Subryan (commission of offense in cruel or heinous manner, general deterrence, specific deterrence) rested on "unsupported facts." (*See* ECF No. 1 at 4, 8; Ground Two.) By that, he means that those facts had to be found by a jury, beyond a reasonable doubt. In support, he cites *Blakely v. Washington,* 542 U.S. 296 (2004). *Blakely,* however, held only that a jury must find facts that

would increase the penalty beyond the prescribed statutory maximum for the offense. *See* 542 U.S. at 304; *see also Apprendi v. New Jersey,* 530 U.S. 466 (2000). Such is not the case here. The statutorily defined sentencing range for aggravated manslaughter is 10 to 30 years. *See* N.J. STAT. ANN. § 2C:11-4(c). Mr. Pichardo was sentenced to 22 years' imprisonment, just above the middle of that range. The aggravating and mitigating factors were used only to guide the sentencing judge's discretionary selection of sentence within that statutory range, and short of the statutory maximum. Accordingly, the court was not required to submit aggravating factors to the jury or to find the facts beyond a reasonable doubt. *See McMillan v. Pennsylvania,* 477 U.S. 79, 79-80 (1986) (holding that aggravating factors under a statutory scheme do not exceed a State's powers unless the maximum sentence is affected); *see also Alleyne v. United States,* 133 S. Ct. 2151, 2152 (2013) (holding that any fact that does not increase a mandatory sentence need not be submitted to a jury); *United States v. O'Brien,* 560 U.S. 218, 224 (2010) (reiterating *McMillan*'s holding that a sentencing factor can be proved to a judge by a preponderance of the evidence).

I consider in addition, however, that this is a claim of ineffective assistance. Under that rubric, counsel may be ineffective for failing to raise an issue of State law that was a potential winner. New Jersey, however, generally follows federal law as to this *Blakely/Apprendi* issue. Applying those federal principles to the New Jersey sentencing system, the State Supreme Court found that the "presumptive term"—*i.e.,* a sentence near the middle of the statutory range—was equivalent to a "statutory maximum" for purposes of *Blakely. See State v. Natale,* 878 A.2d 724 (N.J. 2005). Taking its cue from *United States v. Booker,* 543 U.S. 220, 125 S. Ct. 738 (2005), *Natale* eliminated presumptive terms because, if mandatory, they would trigger the *Blakely* requirements. Instead, *Natale* charged sentencing judges with finding aggravating and mitigating factors by a preponderance, and balancing them to arrive at a just sentence within statutory limits. While the middle of the range might be a valid

starting point, it would no longer constitute a mandatory presumptive sentence. *Natale*, 878 A.2d 724 at 487–88. *See also Almodovar v. Hauck,* Civ. No. 11-5086, 2014 WL 4931276, at *8 (D.N.J. Oct. 1, 2014) (Hillman, J.).

*Natale* was decided on August 2, 2005; Pichardo's sentencing took place nearly two months later, on September 30, 2005.[20] Before announcing the sentence, Judge Subryan acknowledged on the record that "I am aware of our Supreme Court ruling in STATE V. NATALE in August of 2005 where presumptive sentences are no longer the laws of this State." (ECF No. 9-16 at 27) There is no indication that Judge Subryan overlooked *Natale* or reverted to the pre-*Natale* "presumptive sentence" regime.

Nothing about Judge Subryan's finding of aggravating factors by a preponderance of the evidence fell afoul of *Blakely* or *Natale*. Appellate counsel was not ineffective for failing to raise a *Blakely/Natale* claim.

## D.   Ineffective Assistance of Appellate Counsel: Suppression and Evidence Issues

Mr. Pichardo argues that appellate counsel was ineffective for failing to appeal the trial court's evidentiary rulings (Ground One; *see* ECF No. 1 at 6); failing to challenge the trial court's decision to allow the scope on Mr. Pichardo's gun to be "repaired" for trial (Ground Four; *see* ECF No. 1 at 12); and failing to challenge the admissibility of the testimony of the gun's original owner (Ground Five; *see* ECF No. 1 at 14).[21] Mr. Pichardo raised these claims first to the PCR

---

20    *Natale*'s holding was given "pipeline retroactivity"—*i.e.*, it was applied to "defendants with cases on direct appeal as of the date of this decision and to those defendants who raised Blakely claims at trial or on direct appeal." *Natale,* 878 A.2d at 745; *State v. Thomas,* 902 A.2d 1185, 1194 (N.J. 2006).

21    As discussed above, on direct appeal, Mr. Pichardo's counsel made only two arguments: (1) that the trial court's failure to enter a judgment of acquittal on the murder charge "tainted the jury's verdict finding [Mr. Pichardo] guilty of the lesser included offense of aggravated manslaughter"; and (2) that the sentence imposed was manifestly excessive. The Appellate Division rejected both arguments without lengthy discussion. (*See* ECF No. 9-19 at 45.)

court, which denied relief orally. (See ECF No. 9-18 at 29-31.) In an Opinion issued on August 12, 2012, the Appellate Division affirmed that denial of PCR. (*See* ECF No. 9-22.)

### 1.   Failure to appeal suppression rulings

Mr. Pichardo first claims that his appellate counsel erred in failing to challenge the trial court's rulings denying suppression of certain evidence. Before trial, Mr. Pichardo moved to suppress (1) an on-site eyewitness identification given by DJ, a boy in the other car, as unduly suggestive; (2) Pichardo's allegedly un-Mirandized statements to police after he was arrested; and (3) the rifle obtained during an allegedly illegal search of his family's apartment. (*See* ECF No. 9-22 at 7.) Judge Subryan held a pretrial evidentiary hearing on these issues. That hearing lasted two days and included testimony by seven witnesses. At the conclusion of the hearing, Judge Subryan ruled that DJ's eyewitness identification, because it was a traditional confrontation at the scene of the crime, close in time to the events, was not unduly suggestive. (ECF No. 9-5 at 31.) He further found that Pichardo was properly Mirandized and validly consented in writing to waive his Fifth Amendment rights. (*Id.* at 32) Finally, Judge Subryan found, based on the officers' testimony, that Pichardo's mother gave the police informed consent to search her apartment. (*Id.* at 33.) The trial judge "did not find Mrs. Pichardo or her daughter to be credible witnesses. The [trial] Court finds ... that the police translated the Consent to Search form to Mrs. Pichardo who freely and voluntarily consented to the search." (*Id.* at 32.)

Under AEDPA, for exhausted claims, this Court reviews the last reasoned state court decision. *See Harrington*, 562 U.S. at 99. Here, that would be the Appellate Division's decision on appeal from the denial of PCR. I consider whether that court interpreted and applied Supreme Court law, not just incorrectly, but unreasonably. (*See* discussion at Section IV.A and nn. 6–7, *supra*.)

Before the Appellate Division, as he does here, Pichardo claimed that the trial court erred in making the suppression rulings, and asks this Court to find his appellate counsel constitutionally ineffective for not challenging them on direct appeal. Initially, the Appellate Division found that there was no appealable error in the suppression rulings—in particular, "no error in the trial judge's detailed findings of fact and conclusions of law" regarding the on-scene identification of Mr. Pichardo. (*See* ECF No. 9-22 at 9.) The Appellate Division found sufficient evidentiary support for the determination that Mr. Pichardo was "read his Miranda rights, signed the waiver form, and then gave a statement which was reduced to writing." (*Id.* at 10.) And it deferred "to the trial judge's credibility findings" in finding that Pichardo's mother gave informed consent to search her apartment. (*Id.* at 11.) In so ruling, the Appellate Division gave Pichardo's suppression claims a level of review similar to that which they would have received on direct appeal. Nothing about that court's decision hints that a meritorious issue was forfeited procedurally, or blocked by the higher threshold for reversal on PCR.

The Appellate Division further held that Mr. Pichardo's claims of error as to these suppression rulings would not satisfy either prong of *Strickland* As noted above, counsel is entitled, indeed obligated, to select the strongest issues for appeal. Like the State court, I cannot fault counsel's selection, because these fact-intensive rulings were poor candidates for reversal. I therefore agree with the Appellate Division that Pichardo could not satisfy the first, deficient-performance prong of *Strickland*. Even more clearly dispositive, however, is the second, prejudice prong of *Strickland*.

"If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, that course should be followed." *Strickland,* 466 U.S. at 670. Mr. Pichardo has not shown a reasonable probability that, had this issue been raised, the Appellate Division would have reversed his conviction or ordered a new trial. On the contrary, it is quite likely that he would not have prevailed.

Pichardo points to no error in the legal standards applied by Judge Subryan, a legal error being the ordinary foundation of a successful appeal. I have reviewed the case law cited by the Appellate Division against the background of federal constitutional law. I see no error in the Appellate Division's articulation or application of standards governing on-the-scene "show-up" identifications, *Miranda* waivers, or consent searches. (ECF No. 9-22 at pp. 9–11.)

For example, as a matter of law, Mr. Pichardo could not contend that the warrantless apartment search was unlawful *even if* his mother consented to it. *See generally Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S. Ct. 2041 (1973) (consent searches permitted by Fourth Amendment). On appeal, he would have had to challenge the factual finding that she gave consent. The standard of review on such an appeal would have been very daunting indeed:

> [A]n appellate court reviewing a motion to suppress must uphold the factual findings underlying the trial court's decision so long as those findings are "supported by sufficient credible evidence in the record." [Appellate Division decision] (citing *State v. Locurto*, 157 N.J. 463, 474, 724 A.2d 234 (1999)); *see also State v. Slockbower*, 79 N.J. 1, 13, 397 A.2d 1050 (1979) (concluding that "there was substantial credible evidence to support the findings of the motion judge that the ... investigatory search [was] not based on probable cause"); *State v. Alvarez*, 238 N.J. Super. 560, 562–64, 570 A.2d 459 (App. Div. 1990) (stating that standard of review on appeal from motion to suppress is whether "the findings made by the judge could reasonably have been reached on sufficient credible evidence present in the record" (citing *State v. Johnson*, 42 N.J. 146, 164, 199 A.2d 809 (1964))).

*State v. Elders,* 192 N.J. 224, 243-44, 927 A.2d 1250, 1261-62 (2007).

Judge Subryan held a two-day hearing and made credibility-based findings of fact. He weighed the circumstances and considered the relative credibility of the witnesses, such as the police officers, Mr. Pichardo, and Pichardo's mother. Because his findings—for example, that Pichardo's mother gave consent to the search—were based on substantial evidence of record, they would have been nearly unassailable on appeal.

Because these suppression issues would have been unlikely to succeed on direct appeal, I cannot second-guess appellate counsel's strategy, and I cannot find that the omission of those issues resulted in prejudice. Accordingly, the Appellate Division was not unreasonable in holding that appellate counsel's representation surmounted the effectiveness threshold of *Strickland*. *See Werts v. Vaughn*, 228 F.3d 178, 202 (3d Cir. 2000) ("counsel cannot be deemed ineffective for failing to raise a meritless claim"). Habeas relief on this ground is denied.

### 2.    Failure to appeal admission of rifle scope evidence

Mr. Pichardo argues that his appellate counsel was constitutionally ineffective for failing to challenge the trial court's rulings allowing (1) for the telescopic sight on Mr. Pichardo's rifle to be restored to functionality[22] so its use could be explained to the jury; and (2) for the rifle's original owner to testify that the scope had been functional when it was in his possession, some three weeks before the shooting. The Appellate Division, reviewing the denial of PCR, rejected these contentions as lacking sufficient merit to "warrant discussion in a written opinion." (ECF No. 9-22 at 13.) That ruling, though terse, is still entitled to deference under AEDPA, and may be disturbed only if the Appellate Division's application of Supreme Court law was unreasonable. *See Yarborough*, 541 U.S. at 664 (finding that a state court's determination that a claim is meritless demands deference as long as fairminded jurists could disagree on the correctness of the decision).

Mr. Pichardo was charged with murder, and ultimately convicted of the lesser included offense of aggravated manslaughter. There is no dispute that Pichardo fired his rifle into EW's car, killing him. The rifle was a 9mm carbine

---

22    Defense counsel at times referred to the scope as having been "broken," and the defendant refers to the "repair" of the scope. The only explanation of record for the non-functionality of the scope was that the battery was dead, and that was offered on a somewhat tentative basis. A fresh battery was apparently inserted at or about the time of trial. *See infra*.

with what was colloquially called a "laser" scope—actually, apparently, some type of "red dot" sight, which requires a battery to operate. The functionality of the scope might have tended to support the murder charge, because it could support the proposition that Pichardo intentionally aimed at and hit EW. Accordingly, the operability, or not, of the scope on the night of the shooting was a significant issue at trial.

Michael Zaccone, the gun's original owner, testified that the gun was stolen from his home on August 6, 2003, some three weeks before the shooting. At that time, he said, the scope was operational. (ECF No. 9-10 at 85–88.) Lieutenant Mason, the officer who tested the gun, testified that on September 20 or 21, 2003, some three weeks after the incident, the scope was not operational. (*See id.* at 27.) Mason believed the battery was dead. (*Id.* at 28, 89.)

Sometime before trial, however, a fresh battery had been placed in the scope. From the transcript it seems that Zaccone, in the course of his testimony, held the scope and described the operation of the laser sight. (*Id.* at 87–89.)

There was evidence, then, that the scope was working three weeks before the incident, and was not working three weeks after. There was no direct evidence, however, regarding the condition of the scope on August 28, 2003, the night of the shooting. As Judge Subryan put it, "the State did not produce any evidence showing that [the scope] was working on the 28th." (ECF No. 9-10 at 82.)

Judge Subryan's rulings left it to the parties to argue the inference that the scope was or was not operational on August 28, 2003. (*Id.* at 81–82) The State attempted to persuade the jury that the scope had been functional on the night of the crime. Defense counsel argued that there was no evidence of that, and that the shot that killed EW was simply "the unluckiest shot in history." (ECF No. 9-11 at 10.)

Mr. Pichardo now argues that his appellate counsel should have challenged the admission of the evidence regarding the rifle scope. Under the first prong of *Strickland,* however, I must find that counsel's strategic decision to

forgo that issue falls within the bounds of reasonable professional judgment. On direct appeal in New Jersey, evidentiary rulings are reviewed for abuse of discretion, with "substantial deference" given to the trial judge. *See Benevenga v. Digregorio*, 737 A.2d 686, 699 (N.J. Super. Ct. App. Div. 1999). Like the federal courts, New Jersey courts will treat ordinary, non-structural errors as "trial" errors, to be analyzed for harmlessness in the context of the evidence at trial. *See generally State v. Camacho*, 95 A.3d 635, 643 (N.J. 2014). These evidentiary rulings are trial matters that would have been subject to ordinary harmless error analysis.

That the battery was live three weeks before the shooting, and dead three weeks after, would not have led the jury astray. The jury surely recognized the limited relevance of either fact; it is common knowledge that a battery may go dead in three weeks. Nevertheless, this evidence met the low threshold of relevance under N.J.R. Evid. 401; depending on how the jury interpreted it, it might tend to support or negate criminal intent.[23] Nothing about the witnesses' description of the evidence regarding the scope was inflammatory or so prejudicial as to tip the balance under N.J.R. Evid. 403. Or so a competent appellate attorney could reasonably have thought. As a result, the first prong of *Strickland* is not satisfied.

Here again, however, the second prong—*i.e.,* the lack of any serious showing of prejudice—is perhaps a more fruitful approach. The functionality of

---

[23]    That is, the evidence has a "tendency to make more probable ... a fact of consequence to the action." N.J.R. Evid. 401, 1991 Supreme Court Committee Comment. The relevant test is "whether the [proffered evidence] 'renders the desired inference more probable than it would be without the evidence.' " *State v. Davis*, 477 A.2d 308, 312 (N.J. 1984) (quoting *State v. Deatore*, 358 A.2d 163, 172 (N.J. 1976)). Here, the prosecution's "desired inference" was that the scope was operable at the time of the incident. The "without the evidence" scenario would be a hypothetical case in which the scope was shown to be inoperative after the incident, and there was no other evidence. The proffered evidence that the scope was operative before the incident renders it more likely that it worked (for example, that the battery was charged) at the time of the incident.

the sight was most relevant to the murder charge, which required intent to kill.[24]
The jury, however, acquitted Mr. Pichardo of that murder charge. It did not find
that Pichardo aimed the rifle at EW and shot, intending to kill him. Rather, the
jury found Pichardo guilty of the lesser included offense of aggravated
manslaughter. That lesser offense requires, not intent to kill, but
recklessness—*i.e.*, conscious disregard of a substantial and unjustifiable risk
that another's death will result. (ECF No. 9-12 at 17 (jury charge).) The jury's
split verdict implies that they did not necessarily believe Pichardo intended to kill
EW, but that his firing of the gun in the direction of the car manifested a culpable
disregard of a substantial danger of death. It is possible that if the jury found the
scope operable, they might have found Pichardo guilty of intent-to-kill murder; it
is likewise possible that, in rejecting a murder verdict, the jury took into account
the lack of proof that the scope was operable that night. But as to the aggravated
manslaughter verdict the jury actually did reach, the functionality of the scope
was not so essential.[25] So even if counsel had challenged the admission of this
evidence on appeal and prevailed, an appellate court would likely have found its
admission harmless. Prejudice is lacking.

---

[24]   I use "intent to kill" as a shorthand for a more complex concept. For example,
murder may also involve intent to cause serious bodily injury, where death in fact
results. The requirement of purpose or knowledge may encompass, not just
straightforward intent to kill, but knowledge of a substantial risk of death and a high
probability that death would result, or else defendant's awareness that it was practically
certain his conduct would cause death. *State v. Wilder*, 939 A.2d 781, 787 (N.J. 2008).
The jury was so instructed. (ECF No. 9-12 at 14)

[25]   The late Judge Joseph A. Falcone, an able and experienced jurist, presided over
the PCR proceedings. He heard testimony from Pichardo and his trial counsel, and
concluded thus:

> So, even the scope issue, State's position with the scope, was he was never
> going to miss with a scope. You don't miss with a scope unless you're
> blind. So, even the issue about the scope being allowed in evidence didn't
> seem to have the impact that the State was hoping, because the jury in this
> case found that the behavior of Mr. Pichardo was, in fact, reckless.

(ECF No. 9-18 at 28.)

Appellate counsel's decision not to appeal the admission of the rifle scope evidence fell within the broad bounds of professional representation and caused no cognizable prejudice. This claim of ineffective assistance therefore fails the test of *Strickland*. The denial of PCR, and the Appellate Division's summary affirmance on this particular point, were neither contrary to nor an unreasonable interpretation of Supreme Court law. The claim of ineffective assistance of appellate counsel on this claim is therefore denied.

**E.    Ineffective Assistance of Trial Counsel**

Mr. Pichardo alleges that his counsel was ineffective at the trial level for a number of reasons. First, Pichardo asserts that trial counsel was ineffective "for failing to investigate and communicate with his client." (*See* ECF No. 1 at 6, Ground One.) Second, Pichardo claims that trial counsel failed to "argue mitigating factors" during the sentencing hearing. (*Id.* at 11, Grounds Two and Three.) Third, Pichardo claims trial counsel was ineffective for failing to call witnesses on his behalf. (*Id.* at 16, Ground Six.) As is common, ineffectiveness of trial counsel was not raised on direct appeal. The trial court on PCR, however, heard evidence and addressed the merits of the ineffective assistance claims; the Appellate Division, on appeal from the PCR court's oral denial, affirmed in a written opinion; and the New Jersey Supreme Court denied certification. (*See* ECF Nos. 9-18, 9-22, 9-23.) State remedies have therefore been exhausted. *See generally Rose v. Lundy*, 455 U.S. 509 (1982).

### 1.    Failure to communicate about discovery, investigate witnesses, or call witnesses to testify

Mr. Pichardo first alleges that trial counsel failed to communicate effectively with him during discovery, failed to properly investigate potential witnesses, and failed to call potentially helpful witnesses to testify on his behalf. (*See* ECF No. 9-18 (raising these grounds in PCR proceedings).) The facts as developed in the PCR hearing are fatal to those claims.

As to communication about discovery, the Appellate Division noted that "[Mr. Pichardo] conceded during the evidentiary hearing on his PCR application that defense counsel had, in fact, provided him with all the discovery prior to trial and he had read through all the discovery 'once or twice'." (ECF No. 9-22 at 12.) As to failure to investigate pertinent witnesses, the Appellate Division noted that "defense counsel explained at the [PCR] hearing that he did locate [the witnesses] before trial," but judged that the witnesses were unable to provide useful testimony.[26] (*Id.*)

As to counsel's failure to call witnesses, the Appellate Division noted that no such potentially helpful witness had been identified. In the PCR proceedings, Mr. Pichardo claimed that a friend of his, Ariel Guzman, could have supported a claim of self-defense by testifying that he saw the victim, EW, in possession of a gun that night. But trial counsel testified, and the PCR court accepted, that he had found and questioned Guzman, who "was unable to state that he saw the victim with a gun." (*Id.*) That was reason enough for trial counsel's strategic choice not to call Guzman as a witness and subject him to cross examination: Guzman's testimony would not have actually supported Mr. Pichardo's contentions.[27] (*Id.*)

"Accordingly," wrote the Appellate Division, "defendant's claims of ineffective assistance of trial counsel fail to meet either prong of *Strickland* and consequently we reject this argument on appeal." (*Id.* at 13.) It is true that the Appellate Division did not explore the *Strickland* analysis in any detail. Its decision, however, is clear, and is still entitled to deference under AEDPA. *See*

---

[26]   Mr. Pichardo claims that trial counsel failed to contact two witnesses. The PCR court noted that trial counsel actually found and spoke with three potential witnesses. (ECF No. 9-18 at 29.)

[27]   Trial counsel was able to "track down Ariel Guzman, because Ariel Guzman didn't voluntarily show up at his office ... [However,] Mr. Guzman didn't say anything that the victim had a gun in his waistband and/or that he wielded a gun. [Trial counsel] certainly would have been, at a minimum, derelict in his responsibilities to his client if he called Mr. Guzman in those circumstances...." (ECF No. 9-18 at 29.)

*Harrington v. Richter*, 562 U.S. 86, 98 (2011) ("Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief."); *see also Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) (finding that a state court's determination that a claim is meritless demands deference as long as fairminded jurists could disagree on the correctness of the decision). And the Appellate Division's decision is thoroughly consistent with *Strickland*.

The first prong of *Strickland* dictates that, to be considered deficient, counsel's performance must fall below an objective standard of reasonableness: that is, it must diverge from prevailing professional norms. *See* 466 U.S. at 690. The record shows no unreasonable performance by trial counsel here, either generally or specifically in relation to discovery and the investigation of witnesses. The PCR court found, and I agree, that "the record is in direct contravention of [defendant's] position."[28] (ECF No. 9-18 at 30.) Similarly, there is no showing that any arguably deficient performance met *Strickland*'s second prong: prejudice, in the sense of a reasonable probability that the result of the proceeding would have been different. Any shortcomings in counsel's communication with his client about discovery, for example, had no demonstrable consequences; the defendant admittedly received and thoroughly reviewed all discovery before trial. Nor would calling Mr. Guzman, who had no helpful testimony to offer, have changed the outcome in Pichardo's favor.

Mr. Pichardo has not pointed this Court to any evidence that would substantially call into question the reasonableness of the state courts' findings. They are therefore entitled to deference under 28 U.S.C. § 2254(d)(2). Accordingly, his claims that his trial counsel failed to communicate with him during discovery, investigate potential witnesses, or call pertinent witnesses fail to persuade. Habeas relief on these grounds is denied.

---

[28]    "The transcript clearly reflects [that] when the State was attempting to introduce certain evidence ... how vigorous [trial counsel] argued against it. The record supports how hard fought the suppression issues were." (ECF No. 9-18 at 30.)

### 2.     Failure to argue mitigating factors at sentencing[29]

Next, Mr. Pichardo claims that trial counsel was ineffective for failing to press certain mitigating factors during the sentencing hearing. (*See* ECF No. 1.)[30]

I turn to the first prong of *Strickland,* deficient performance. Mr. Pichardo argues that, during his sentencing hearing, trial counsel failed to argue mitigating factors. That omission, he says, was objectively unreasonable and fell short of professional standards. (*See* ECF No. 1 at 11.) The sentencing transcript contradicts Pichardo's allegations. (*See* ECF No. 9-16 at 4-6.) Trial counsel delivered a plea for leniency, citing his client's youth, his prospects, his educational success, and his generally law abiding behavior.[31] (*Id.* at 5.) And Judge Subryan did specifically accept that Pichardo had generally lived a law abiding life, which was mitigating factor number seven. (*See id.* at 27 ("[Mr. Pichardo] has led a law abiding life for a substantial period of time."); *see* N.J. STAT. ANN. § 2C:44-1(b)(7).)

The Appellate Division cited that sentencing transcript and accepted that counsel had urged mitigation upon the court, which was thoroughly familiar with Mr. Pichardo and the case. My review of the record leads me to the same conclusion. *A fortiori,* the state court's ruling was not an unreasonable application of Supreme Court law. Pichardo is not entitled to habeas relief on this ground and his claim of ineffective assistance of trial counsel is denied.

---

[29]     This contention was raised as part of Ground Three in Mr. Pichardo's petition.

[30]     To remove any doubt, I briefly address exhaustion of state remedies as to this particular sub-point. Although the trial-level PCR court did not discuss this claim, it was raised. The Appellate Division noted the claim, but denied it as "lacking sufficient merit to warrant discussion in a written opinion." (ECF No. 9-22 at 13.) The New Jersey Supreme Court's denial of certification, as is customary, contained no substantive discussion of any issue. This claim, however, was raised and exhausted by Mr. Pichardo, so this court is empowered to hear it. *See Rose v. Lundy, supra.*

[31]     "This is a young man who distinguished himself by finishing school, who was about to enter college ... I ask you to realize the goodness in Edgar ... and be merciful, because mercy is the province of this Court...." (ECF No. 9-16 at 4-5.)

### V.  CERTIFICATE OF APPEALABILITY

This Court must determine whether the petitioner is entitled to a certificate of appealability in this matter. *See* 3d Cir. R. 22.2. A district court will issue a certificate of appealability if the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). As to one claim, of course, the petitioner has prevailed. As to the other, which I have denied, the discussion above demonstrates that he has not made such a showing, and I will not issue a certificate of appealability.

### VI. CONCLUSION

The Petition will be granted solely as to Mr. Pichardo's claim of ineffective assistance of appellate counsel with respect to the application of aggravating factor 1 during sentencing. I will order that Mr. Pichardo be resentenced without the application of aggravating factor 1. The habeas petition is otherwise denied.

An appropriate Order accompanies this Opinion.

Dated:   December 22, 2015

KEVIN MCNULTY
United States District Judge

47